UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) Case No. 4:12-CV-80 (CEJ) |
| BURTON DOUGLAS MORRISS, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on the motion of defendant Burton Douglas Morriss for an order confirming that Federal Insurance Company may advance defense costs on his behalf pursuant to a policy of Directors & Officers ("D&O") insurance purchased by defendant Acartha Group. Plaintiff and the receiver have filed responses in opposition to the motion and the issues are fully briefed.

I.    **Background**

On January 17, 2012, the Securities and Exchange Commission (SEC) filed suit against defendant Burton Douglas Morriss and four investment entities: Acartha Group, LLC; MIC VII, LLC; Acartha Technology Partners, LP; and Gryphon Investments III, LLC (the "investment entities" or "Acartha"). Morriss Holdings, LLC, is a family business controlled by Morriss and is named as a relief defendant. According to the SEC, the entities received from investors at least $88 million, $9 million of which Morriss misappropriated and transferred to himself and Morriss Holdings. The SEC asserts claims pursuant to Section 17(a) of the Securities Act,[1] Section 10b-5 and Rule

---

[1] 15 U.S.C. § 77q(a).

10b-5 of the Securities Exchange Act,[2] and Sections 206(1), 206(2), and 206(4) and Rule 206(4)-8(a)(2) of the Investment Advisers Act.[3]  On January 17, 2012, the Court appointed a receiver and entered an order freezing all the assets of the investment entities.  The asset freeze order restrained all individuals and entities other than the receiver from transferring or receiving any assets of the investment entities and Morriss Holdings.

**The Policy**

Federal Insurance Company issued Venture Capital Asset Protection Policy No. 8207-6676 to Acartha for the policy period of December 1, 2010, to December 1, 2011. Policy [Doc. #73-1]. An endorsement executed on December 2, 2011, extended the policy period to December 1, 2012.  [Doc. #81-1].  The policy provides the following coverages:

Insuring Clause 1:  Management Liability Coverage

1.      [Federal] shall pay, on behalf of each Insured Person, Loss for which the Insured Person is not indemnified[4] by the Organization and which the Insured Person becomes legally obligated to pay on account of any Claim . . .

Insuring Clause 2:  Management Indemnification Coverage

2.      [Federal] shall pay, on behalf of the Organization, Loss for which the Organization grants indemnification to each Insured Person, as permitted or required by law, which the Insured Person becomes legally obligated to pay on account of any Claim . . .

_____

[2]15 U.S.C. § 78j(b) and 17 C.F.R. 20.10b-5(b).

[3]15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4) and 17 C.F.R. § 275.206(4)-8(a)(2).

[4]On February 13, 2012, Federal demanded that Acartha indemnify defendant Morriss to the fullest extent permitted by law. Def't Ex. B at 6 [Doc. #73-2]. Because Acartha is in "financial impairment" as defined by the policy and may refuse to indemnify defendant Morriss, Federal may indemnify him for all covered loss, including amounts within the $100,000 deductible.  Id. (citing Policy § 13).

Insuring Clause 5: Organization Liability Coverage[5]

> [5.   Federal] shall pay, on behalf of the Organization, Loss for which the Organization becomes legally obligated to pay on account of any Claim . . .

Policy, Def't Ex. A [Doc. #73-1].

The policy has a limit of liability of $3,000,000 for each loss and an aggregate limit of liability of $3,000,000 for each policy period.  Id. Declarations.  A $100,000 deductible amount applies to loss incurred by Acartha; there is no deductible for loss incurred by Morriss.  Id. Declarations.  A priority of payments provision requires Federal to first pay claims arising under Insuring Clause 1; other claims are payable only to the extent of the remaining limit of liability.  Id. Endorsement 11.  "Loss" is defined to include defense costs.  Id. § 32, Endorsement 10.  This is a "wasting policy" in that payment of defense costs erodes the limits of liability.  Id. § 11.  The policy requires Federal to advance defense costs on a current basis without regard to the potential for other future payment obligations under the Policy.  Id. §§ 14, 15.

On September 15, 2011, the SEC commenced an investigation into Acartha. Acartha requested coverage for defense of itself, Morriss and Dixon Brown, who is a director and the secretary of Acartha.  On November 23, 2011, Federal accepted the SEC investigation as a claim under the policy and agreed to begin advancing defense costs.  On November 29, 2011, investors filed suit against Morriss and Acartha in St. Louis County, alleging breach of contract and breach of fiduciary duty.  Nixon, et al. v. Morriss et al., Co. 11SL-CC04718.  Federal accepted the Nixon litigation as a related claim and agreed to begin advancing Acartha its defense costs in the action.

---

[5]The organization liability coverage is additional coverage found in Endorsement/Rider 1.

As relevant to the present motion, Federal has represented to counsel for Morriss that it will advance defense costs incurred in connection with this action, subject to a reservation of its rights to determine that coverage is not available under the policy.  Correspondence dated Feb. 13, 2012 at 12 ("Federal reserves its rights under [the fraudulent act exclusion] should it be determined that an Insured engaged in such conduct, including the right to recoup Defense Costs advanced on behalf of any Insured . . .  Federal will therefore require the Insureds to execute undertakings guaranteeing the repayment of Loss if it is finally determined that Loss incurred by such Insured is not covered.")  [Doc. #73-2].

## II.  Discussion

The SEC argues that the interests of the investors should be placed above any interest Morriss has in any frozen assets. "Neither civil nor criminal defendants have the right to use frozen investor funds to pay their counsel" and "[t]o succeed on a motion to modify [a] freeze to permit payment of attorney's fees and other expenses, [a] defendant must establish that such a modification is in the interest of defrauded investors."  S.E.C. v. Credit Bancorp Ltd., 99 CIV. 11395, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (internal quotation and citation omitted).  This is in keeping with the principle that "a defendant cannot fund a defense with 'loot' or 'gleanings of crime.'"  S.E.C. v. Stanford Int'l Bank, Ltd., et al., No. 3:09CV298N at 6 (N.D. Texas filed Oct. 9, 2009).  The SEC's argument is directed the efforts of defendants to gain access to their own assets placed under an asset freeze.  Morriss is not asking the Court to release frozen assets and the SEC's argument has no application here.

The receiver asserts that the Federal insurance policy belongs to the receivership estate.  She contends that the policy is one of the few assets available and that equity

-4-

dictates that it should be preserved for the purpose of reimbursing defrauded investors.[6]   Defendant Morriss does not contest that the policy belongs to Acartha. However, ownership of the policy does not dictate whether the proceeds are part of the receivership estate.  See *In re* Louisiana World Exposition, Inc., 832, F.2d 1392, 1399 (5th Cir. 1987) ("The question is not who owns the policies, but who owns the liability proceeds.").  The answer to this question is governed "by the language and scope of the policy at issue[,] not by broad, general statements."    *In re* Allied Digital Technologies, Corp., 306 B.R. 505, 509 (Bankr. D. Del. 2004);[7] see also *In re* Downey Financial Corp., 428 B.R. 595, 607 (Bankr. D. Del. 2010) ("Courts generally closely examine the . . . terms of the liability insurance policy at issue ).

---

[6]The receiver does not state in her opposition what assets in the funds under her control may be available for eventual distribution.  The complaint alleges that Morriss and the investment entities received approximately $88 million dollars and that, in 2011, there were approximately $53 million in investments.  Morriss is alleged to have misappropriated $9 million.

[7]Because there are comparatively few cases examining the ownership of insurance proceeds in the context of a receivership, it is appropriate to consider the treatment of the issue under bankruptcy law, where the courts must frequently decide whether persons insured under a D&O policy are entitled to the proceeds when the named insured is a debtor in bankruptcy proceedings.  See Intermarque Auto. Products, Inc. v. Feldman, 21 S.W.3d 544, 550 n.11 (Tex. App. 2000) (applying bankruptcy law in receivership action because the bankruptcy estate "stands in the shoes" of the debtor).

Under the laws of Missouri and New Jersey,[8] insurance policies are contracts to which the rules of contract construction apply. Peters v. Employers' Mut. Cas. Co., 853 S.W.2d 300, 301-02 (Mo. 1993) (*en banc*) (unambiguous insurance policies will be enforced as written); President v. Jenkins, 853 A.2d 247, 254 (N.J. 2004) ("If the policy terms are clear, courts should interpret the policy as written and avoid writing a better insurance policy than the one purchased.")

Thus, the Court turns to determining whether the policy proceeds belong to the receivership estate.

> Two basic rules run across [bankruptcy] decisions, and are properly applied to the simplest-case scenarios: When [a D & O] insurance policy provides coverage only to the debtor, courts will generally rule that proceeds are property of the estate. . . On the other hand, when a policy provides coverage only to directors and officers, courts will generally rule that the proceeds are not property of the estate.

In re Petters Co., Inc., 419 B.R. 369, 376 (Bankr. D. Minn. 2009) (quoting In re World Health Alternatives, Inc., 369 B.R. 805, 810 (Bankr. D. Del. 2007)). "[A]ny individual insured has a contractually-distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of that insured itself." Id.; see also Louisiana World Exposition, 832 F.2d at 1400 (where policy covered only directors and officers, corporation did not have property interest in policy proceeds for bankruptcy purposes).

---

[8]Defendant Morriss states that Acartha and Federal contemplated that New Jersey law would apply to the insurance policy but that choice-of-law issues need not be addressed because New Jersey and Missouri law both provide that unambiguous insurance polices should be enforced as written. See also Spirtas Co. v. Fed. Ins. Co., 481 F. Supp. 2d 993, 997 (E.D. Mo. 2007) (finding agreement in Missouri and New Jersey law regarding contract interpretation). The plaintiff and receiver do not address choice of law issues.

In this instance, the policy provides coverage to the investment entities as well as to the individual directors and officers. Thus, arguably, the proceeds belong to the investment entities and are subject to the asset freeze. However, "[a] bankruptcy estate can have no greater claim to the proceeds of the property of the estate than the debtor would have had outside of bankruptcy." In re Cybermedica, Inc., 280 B.R. 12, 16 (Bankr. D. Mass. 2002). Thus, the Court asks whether the debtor's estate is worth more with the insurance proceeds than without them. In re Minoco Grp. of Companies, Ltd., 799 F.2d 517, 519 (9th Cir. 1986).

> [W]hen there is coverage for the directors and officers and the debtors, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution. [And], when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not the property of the bankruptcy estate.

In re Allied Digital Technologies, Corp., 306 B.R. 505, 512 (Bankr. D. Del. 2004) (emphasis added).

The SEC urges the Court to find that the proceeds belong to the investment entities because the receiver may be able to raise and settle claims against former officers. The SEC cites Endorsement 9 of the policy as the source of the receiver's claim to such proceeds. However, Endorsement 9 is limited to the context of a bankruptcy proceeding and thus would not appear to provide the receiver with a claim to insurance proceeds on behalf of the investment entities. Plaintiff further argues that "[t]he Investment Entities may very well be the subject of claims by others relating to the fraud Morriss perpetrated." Plaintiff's Opp. at 12 [Doc. #91]. As plaintiff argues elsewhere, however, the policy contains an exclusion, applicable to all insuring clauses, of coverage for claims related to fraud and misappropriation. Thus, the policy will not

-7-

provide coverage to the investment entities if they are found liable for investors' fraud claims.

Fidelity agreed to pay Acartha's defense costs in connection with the SEC investigation and Nixon litigation. There is no indication in the record that the receiver has requested payment of such costs in connection with these claims. Even if she has made such a request, the policy includes a priority of payments provision requiring Federal to pay claims under Insuring Clause 1 (providing coverage to an insured individual) before claims under any other insuring clause, including those of the organization. As a result, as a matter of contract, any claim that the receiver may have for defense costs is subordinate to the coverage for Morriss and any other insured persons under Insuring Clause 1. Similarly, Federal is required to advance defense costs on a current basis without regard to the potential for other future payment obligations. Given these two provisions of the insurance policy, the investment entities' claims to the proceeds do not take priority over those of Morriss or other directors. Thus, there is no basis for concluding that "the policy actually protects the estate's other assets from diminution." Allied Digital, 306 B.R. at 512. To the extent that the receiver's "real concern is that payment of defense costs may affect [her] rights as a plaintiff seeking to *recover from* the D & O Policy rather than as a potential defendant seeking to be *protected by* the D & O Policy," that is not the purpose of the Federal policy. Id. at 513 (emphasis in original).

Allowing the payment of Morriss's defense costs under the Fidelity policy is also consistent with the few cases addressing D&O policy proceeds in the context of a receivership. In S.E.C. v. Stanford Int'l Bank, Ltd., 3:09-CV-298-N (N.D. Tex. Oct. 9, 2009), the district court issued a freeze order and appointed a receiver for the

-8-

assets in a large securities fraud case.  The individual defendants and relief defendants sought access to the proceeds of three D&O policies purchased by the Stanford entities to pay defense costs in the SEC's civil action and a related criminal case.  The district court had previously denied a motion to unfreeze assets in the estate for the purpose of paying defense costs.  Id. at 6.  The court was later asked to address the separate question of whether defense expenses could be paid out of the proceeds of the D&O policies.  The district court assumed without deciding that the proceeds were part of the receivership estate.  Id. at 4.  The receiver in Stanford argued that allowing the insurer to pay defense costs would decrease coverage dollars for possible distribution to defrauded investors.  Id. at 6.  Although a primary purpose of receivership was to redress injury to the investors, the court nonetheless concluded that it was appropriate to permit payment of defense costs because the receivership's claim to the policy proceeds was "hypothetical" and "speculative."  Id. at 7.  By contrast, denying the directors and officers coverage would expose them to a real and immediate harm -- the inability to defend themselves in civil actions in which they did not have the right to appointed counsel.⁹  Id. at 7-8.

In Executive Risk Indemnity, Inc. v. Integral Equity, L.P., No. 3:03CV269, 2004 WL 438936, at *13 (N.D. Tex. Mar. 10, 2004), the district court addressed whether the proceeds of a liability insurance policy that covered two groups of coinsureds -- one group in receivership, and the other not — could be distributed to the insureds that were not in receivership without violating receivership law.  The policy at issue covered

_____

⁹Plaintiff asserts that access to the policy proceeds was denied to the lead defendant, Allen Stanford.  A footnote to the decision suggests otherwise.  Id. at 8 n.3 ("the Court's authorization to disburse proceeds extends to any covered officer or director").

defense costs and "damages, judgments, awards, settlements and Defense Expenses which an Insured is legally obligated to pay as a result of a Claim." The district court determined that the proceeds of the policy were owed "not to the Insured but to successful third-party claimants against the Insured, as well as to the Insured's attorneys defending against those claims." Id. The entities in receivership thus had no cognizable interest in the proceeds and payment of defense expenses would not violate receivership law. Id.

The SEC argues that the conduct alleged in its complaint falls within a number of coverage exclusions in the policy and that at a later date it may be found that Morriss is not entitled to payment of his defense costs. Federal has not sought a declaration of noncoverage from the Court and thus the subsequent application of any policy exclusions is not relevant. See Cybermedica, 280 B.R. at 19 (declining to consider question of policy exclusions); Stanford Int'l Bank, 3:09CV298 at 8-9 (insurer may ultimately deny coverage as barred by various exclusion but issue will be addressed when ripe).

Finally, because Morriss's entitlement to the proceeds is a matter of contract and not equity, his delay in producing discovery and his assertion of his Fifth Amendment rights with respect to the court-ordered accountings are not material to the decision.

III. Conclusion

Based upon the above analysis, the Court finds that the proceeds of the Federal insurance policy are not part of the receivership estate. Thus, the asset freeze order previously entered does not bar Federal from disbursing proceeds to pay Morriss's defense costs in accordance with the policy's terms and conditions. The Court makes

no decision with respect to whether Morriss's defense costs are excluded from coverage under the policy.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of defendant Burton Douglas Morriss for an order conforming that insureds are entitled to advancement of defense expenses under insurance policy [Doc. #72] is **granted**.

**IT IS FURTHER ORDERED** that Federal Insurance Company is authorized to make payments under the Venture Capital Asset Protection Policy No. 8207-6676 up to the policy's limit of liability to or for the benefit of defendant Morriss (or any Insured Persons or Organization as those terms are defined in the policy) for defense costs incurred in connection with this litigation.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 8th day of May, 2012.

-11-