UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12-CV-80 (CEJ) |
| | ) | |
| BURTON DOUGLAS MORRISS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the separate motions of defendant Burton Douglas Morriss and relief defendant Morriss Holdings, LLC, to dismiss the complaint or, in the alternative, for a more definite statement.  Plaintiff Securities and Exchange Commission (SEC) has filed a response in opposition to the motions and the issues are fully briefed.

### I.   Background

The Court relies on the factual allegations in the complaint as true and affords the non-moving party all reasonable inferences from those allegations.  See Palmer v. Illinois Farmers Ins. Co., 666 F.3d 1081, 1083 (8th Cir. 2012).

### A.   The Defendants

The SEC brings this action against defendants Burton Douglas Morriss and four investment entities---Acartha Group, LLC (Acartha); MIC VII, LLC; Acartha Technology Partners, LP (ATP); and Gryphon Investments III, LLC (collectively, the "investment entities")---asserting various claims of fraudulent misconduct in violation of federal securities laws.  Defendant Morriss is Acartha's Chief Executive Officer and chairman of its board of directors.  Acartha is a private equity fund management company

established in 2003.  Gryphon Investments is also a management company and the general partner of ATP.  MIC VII and ATP are private equity funds formed to invest in companies in the financial services and technology sectors.  Morriss Holdings, LLC, is a family business controlled by Morriss, and is named solely as a relief defendant. Complaint ¶¶ 4-9, 13, 15, 17 [Doc. #1].

Acartha's business included managing the day-to-day operations of the funds and selecting the private companies in which they made investments.  Acartha collected a 2% management fee from investors' committed capital and a percentage of "carried interest"-- defined as the net profit from the sale of a private equity fund's portfolio company after investors received their distributions.  ¶ 14.  Investors in Gryphon also received a percentage of the carried interest; in addition, they had the "option to convert their Gryphon Investments shares into common partnership shares and/or invest in ATP."  ¶ 16.

Morriss solicited investments through emails, phone calls and meetings with potential investors.  ¶ 13.  From 2003 to 2011, approximately 97 investors invested at least $88 million in preferred shares of, or membership interest in, the investment entities.  ¶ 15.  Those who invested in Acartha and Gryphon did so to receive a percentage of the carried interest.  ¶ 16.  As of 2011, approximately $53 million had been invested in portfolio companies through ATP, MIC VII, and the special purpose vehicles.  ¶ 18.

### B.    Misappropriation of Investment Entity Funds

As early as 2005, Morriss took money from and made loans to Acartha.  ¶ 21. In early 2006, Acartha's new Chief Financial Officer implemented a "netting agreement," which tracked the difference between the amounts Morriss and Morriss

Holdings advanced to and took from Acartha. The agreement did not provide for accrual of interest. In December 2006, Morriss and Morriss Holdings owed Acartha approximately $2.2 million. That debt was satisfied by another entity associated with Morriss. Id. In 2008, Acartha's CFO changed the manner for recording the transfers to Morriss and Morriss Holdings from non-interest-bearing transfers to individual promissory notes that provided for the payment of interest. ¶ 22. The notes were not collateralized and did not have a due a date. Id.

Between March 2008 and June 2009, Morriss transferred approximately $1.7 million out of a total of $3.75 million of new investments in Gryphon to himself and Morriss Holdings. He also used $305,000 of Gryphon investor funds to pay interest that was due on his personal line of credit. ¶¶ 26, 44. Morriss was experiencing financial difficulties during this time and became delinquent on several million dollars in personal loans. In addition to selling personal assets, he continued to move money from the investment entities to himself and Morriss Holdings. ¶ 23. Between September 2009 and August 2010, Morriss took at least $1.4 million out of approximately $6 million in new investments in ATP. ¶ 26. By the end of 2009, Morriss and Morriss Holdings owed Acartha and the investment entities approximately $2 million. ¶ 24. These transfers were not disclosed to investors. ¶ 44.

Acartha's financial condition was deteriorating as well. ¶ 25. Officers of Acartha and ATP expressed concern to Morriss about the extent of the transfers from the investment entities to him and to Morriss Holdings. In December 2008, Acartha's CFO complained to Morriss after he transferred $50,000 from ATP to himself without advising the CFO. The CFO left the company soon after, motivated in part by the transfers. Id. In 2010, in anticipation of an external audit, Acartha's management

-3-

consolidated all the promissory notes and reclassified the transfers to Morriss and Morriss Holdings into a single note receivable from Morriss Holdings to Acartha Group. ¶ 27.

Despite the deterioration in Acartha's condition, Morriss continued to transfer money to himself and Morriss Holdings; between December 31, 2009 and September 30, 2011, the net transfer of funds from Acartha Group to Morriss or Morriss Holdings was at least $6.6 million plus interest.  ¶ 28.  Morriss used the funds to make alimony payments, pay interest on personal loans, and to take a hunting trip in Africa.  ¶ 29.

### C.    The MIC VII Scheme

In July 2008, MIC VII obtained a loan from Wachovia Bank in the amount of $2.5 million, which Morriss personally guaranteed.  MIC VII used the loan proceeds to acquire stock in one of its portfolio companies on behalf of investors.  MIC VII was unable to pay back the loan and sold the stock to ATP for $2.5 million.  ¶ 37.  Rather than repay the Wachovia loan, defendant Morriss used the $2.5 million to pay down a personal loan unrelated to the operations of MIC VII.  Investors were not informed that Morriss received the proceeds of the sale.  ¶ 38.

The Wachovia debt remained outstanding.  In 2010, Morriss recruited additional investors for MIC VII to obtain funds to satisfy the debt.  The MIC VII operating agreement required Acartha Group to obtain the unanimous consent of its existing investors before admitting new investors.  ¶ 39.  Morriss circumvented the consent requirement by directing the new investors' money to a new entity – Acartha Group Funding, LLC – which was managed by Morriss and Acartha.  Acartha Group Funding was supposed to invest the funds in Acartha, which would then invest the funds in MIC VII on behalf of the new investors.  Acartha agreed to distribute more than 10% of any

-4-

future MIC VII distributions to the new investors. In actuality, the new investors wired their funds directly to Wachovia Bank to satisfy the MIC VII loan. ¶ 40. The transaction resulted in the dilution of the value of the interests of the existing MIC VII investors without their knowledge. ¶ 41.

### D.  Misrepresentations and Omissions to Investors

#### 1.  The Offering and Operating Documents

Plaintiff alleges that defendants defrauded investors by failing to disclose that Morriss would or could use investor proceeds for personal use. Morriss deliberately requested that the investment entities use vague, broad language in their offering and operating documents, with the result that investors were misled as to how their funds would be used. ¶¶ 30-31.

The 2005 MIC VII amended operating agreement stated that the "Managing Member [Acartha Group] is authorized and empowered on behalf of and in the name of the Company to carry out any and all of the purposes of the Company and to perform all acts and enter into and perform all contracts and undertakings that it may, in its sole discretion, deem necessary, advisable or incidental thereto." The document did not advise investors that investor money would be transferred from MIC VII to Morriss and Morriss Holdings. ¶ 34.

Acartha Group's 2007 Private Placement Memorandum provided that "net proceeds of this offering after payment of expenses are anticipated to be used to repay existing obligations of the Company and for working capital purposes. Management will have broad discretion with respect to the application of these funds." The memorandum did not advise investors that Acartha would use the funds to make personal transfers to Morriss and Morriss Holdings.

-5-

In contrast to the vague or broad language in the Acartha and MIC VII documents, the ATP 2008 limited partnership agreement stated that "the General Partner [Gryphon Investments] may not, voluntarily or involuntarily . . . sell[,] assign, transfer, pledge, mortgage, hypothecate, encumber or therein dispose of or grant a security interest in, all or any of its interest except as otherwise specifically set forth herein.  The General Partner *may not borrow or withdraw any funds or securities from the Partnership* except as expressly permitted by this Agreement."  ¶ 32 (emphasis in complaint).  There is no provision advising investors that investor funds could be transferred or loaned to Morriss or Morriss Holdings.  Similarly, the 2008 operating agreement for Gryphon Investments provided that managers could "make loans or advances to other Persons" but specifically excluded "members, Managers and Affiliates of Members and of Managers."  ¶ 33.

2.    <u>Misrepresentation and Omissions to Gryphon Investors</u>

In 2008, Gryphon Investments raised funds through the sale of "Series A Cumulative Preferred Shares."  ¶ 43.  Morriss represented to investors in these shares that they would receive a 10% annual dividend and a portion of the company's carried interest.  Morriss also told investors that their money would be used only to fund working capital and other expenditures.  However, of the $3.75 million that Gryphon Investments raised from investors between March 2008 and June 2009, $1.7 million was transferred to Morriss and Morriss Holdings, $1.6 million was transferred to Acartha, and $305,000 was used to pay interest on Morriss's personal line of credit.  ¶ 44.  These transfers routinely occurred almost immediately after investors provided funds and were not disclosed to investors.  <u>Id.</u>  Morriss had also told investors that Gryphon was the general partner and manager of ATP.   In November 2008,

-6-

management of ATP was transferred to Acartha without notice to investors. ¶ 45. Finally, Morriss had told investors in Gryphon that they had the right to convert their shares to limited partner interest in ATP. The SEC alleges that Morriss did not permit shareholders to make this conversion. Id.

### E. Procedural Background

On January 17, 2012, the SEC filed this action. Based on the factual allegations stated above, the SEC presents eight causes of action. First, the SEC asserts that the defendants committed fraud in the offer or sale of securities in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (Counts I and II). Next, the SEC alleges the defendants committed fraud in connection with the purchase or sale of securities in violation of Section 10b-5 and Rule 10b-5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 (Count III), and that defendant Morriss aided and abetted the investment entities' violations (Count IV). The SEC also alleges that defendants Morriss, Acartha, and Gryphon Investments violated Sections 206(1), 206(2), and 206(4) and Rule 206(4)-8(a)(2) of the Investment Advisers Act, 15 U.S.C. §§ 80b-6(1, 2 and 4) and 17 C.F.R. § 275.206(4)-8(a)(2) (Counts V and VII), and that Morriss aided and abetted Acartha and Gryphon in these violations (Counts VI and VIII). Each count incorporates the factual allegations by reference, recites the elements of the cause of action, and generally asserts that the defendants' actions meet those elements.

Also on January 17, 2012, the Court appointed a receiver for the four investment entities and entered an order freezing their assets. On March 22, 2012, with the consent of the receiver, the Court entered a permanent injunction permanently restraining the investment entities from future violations of securities laws and ordering

them to disgorge all ill-gotten gains and pay a civil penalty, in amounts to be determined at a later date.  The receiver did not admit or deny the allegations in the complaint on behalf of the investment entities.  [Doc. #101].

## II. **Legal Standard**

Fed.R.Civ.P. 9(b) requires a heightened pleading standard for complaints alleging fraud.  The Eighth Circuit has described Rule 9(b)'s particularity requirement:

> Rule 9(b)'s particularity requirement demands a higher degree of notice than that required for other claims, and is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations.  To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result.  Put another way, the complaint must identify the "who, what, where, when and how" of the alleged fraud.

United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006) (internal citations omitted).  A plaintiff must state an underlying basis for its assertions sufficient to provide indicia of reliability.  Id. at 557 (citation omitted).  While a plaintiff need not allege specific details of every alleged fraud, the plaintiff must provide some representative examples of the alleged misconduct.  Id.

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint.  The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals  based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded

complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp., 550 U.S. at 570. See also id. at 563 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement.") "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 555.

### III. Discussion

The SEC argues that Morriss orchestrated the misappropriation of \$9 million in investor funds for his personal use through two different "schemes." The first scheme involved transfers of funds from the investment entities to Morriss and/or Morriss Holdings. The second scheme involved the fraudulent dilution of the shares of MIC VII in order to cover up Morriss's misuse of MIC VII funds to pay a personal loan. The SEC alleges that defendants violated the Securities Act, the Exchange Act, and the Advisers Act. Defendant Morriss and relief defendant Morriss Holdings move to dismiss the complaint, arguing that plaintiff fails to allege fraud with particularity and that it has failed to sufficiently plead elements of its causes of action. In addition, they assert that the complaint impermissibly employs "shotgun" and "puzzle" pleading.

#### A. Morriss Holdings

Morriss Holdings is named as a relief defendant. Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does

not have a legitimate claim to those funds.  SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998).

Morriss Holdings moves for dismissal pursuant to Rule 9 and Rule 12(b)(6).  The SEC argues that the motion of Morriss Holdings should be denied because, as a relief defendant, it is not accused of any wrongdoing.  Morriss Holdings counters that the complaint refers collectively "the defendants" without distinguishing among them, leaving the impression that Morriss Holdings participated in the alleged wrongdoing. The Court believes this is a misreading of the complaint: Morriss Holdings is identified as a relief defendant at the outset of the complaint.  ¶ 9.  In the introductory section of the complaint, the SEC alleges that Morriss and the four investment entities, but not Morriss Holdings, committed alleged violations of the securities laws.  ¶ 3.  In the misappropriation section, the SEC alleges that Morriss transferred funds; Morriss Holdings is identified solely as receiving a portion of those funds, an allegation entirely consistent with its status as a relief defendant.  ¶¶ 19-29.  In the misrepresentations and omissions sections, the SEC names Morriss and the investment entities, but not Morriss Holdings, as the alleged wrongdoers.  ¶¶ 30-36.  And, finally, in the sections alleging fraud against investors in MIC VII and Gryphon, Morriss Holdings is identified only as receiving funds, not as initiating improper transfers.  ¶¶ 42-45. The Court concludes that there is no ambiguity regarding Morriss Holdings's status as a relief defendant.[1]

---

[1]Morriss Holdings also asserts that it is compelled to speak on behalf of the other corporate defendants, in whom it has a "potential" interest, because the receiver agreed to enter a consent judgment without first insisting that the SEC clarify its separate causes of action against each defendant.  Morriss Holdings cites no authority that allows it to seek dismissal for these entities where the receiver has not. Furthermore, defendant Morriss's arguments for dismissal apply with equal force to the claims against the investment entities.

## B.    Style of Pleading

Defendants contend that the SEC's complaint should be dismissed because it employs an impermissible style of pleading, either "shotgun" or "puzzle" pleading, or both.  "Shotgun" pleadings are those that "incorporate every antecedent allegation by reference to each subsequent claim for relief or affirmative defense."  SEC v. Fraser, No. CV–09–443, 2009 WL 2450508, at *14 (D. Ariz. Aug. 11, 2009) (internal quotations and citations omitted).  "Puzzle" pleadings require the court and the defendant to match statements with the reason they are false or misleading.  Id.  "Although the Eighth Circuit has not directly addressed the issue in a case brought by the SEC, some courts have stated that a complaint relying on shotgun or puzzle pleading fails to meet the particularity requirements of Rule 9(b)."  SEC v. Das, No. 8:10CV102, 2010 WL 4615336, at *6 (D. Neb. Nov. 4, 2010) (citations omitted).  "The central problem [with shotgun pleadings] is that the factual particularity of the [previous] paragraphs is not connected to the otherwise generally pled claim in any meaningful way. . .  The lack of connection between the substantive count and the factual predicates is the central problem with each of the enumerated counts in the complaint, because . . . plaintiffs have not connected their facts to their claims in a manner sufficient to satisfy Rule 9(b)."  Wagner v. First Horizon Pharmaceutical Corp., 464 F.3d 1273, 1279-80 (11th Cir. 2006).

Defendant Morriss complains that the style of pleading makes it impossible to determine which fraud, deceit, misrepresentation or omission was perpetrated by which defendant.  The Court believes that he overstates the difficulty of determining which conduct is attributed to him or which securities statute the conduct is alleged to have violated.  Unlike the complaints dismissed in Wagner and Fraser, the complaint

here is not hundred of paragraphs long. Furthermore, Morriss is the only individual defendant named and he controlled all the defendant investment entities. The factual allegations are relatively brief and a more detailed statement of how they relate to the causes of action is not necessary for Morriss to prepare a responsive pleading. See Das, 2010 WL 4615336 at *6 (rejecting challenge to form of pleadings where complaint "does not contain hundreds of paragraphs," or involve numerous defendants and voluminous documents).

## C.   Particularity Under Rule 9

Defendants argue that the complaint fails to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). To meet the requirements of Rule 9 in a securities action, the SEC must "specify objectionable transactions, state the time, place and content of financial statements, [and] identify allegedly misleading statements and the respects in which they are false or inaccurate." SEC v. Tiffany Industries, Inc., 535 F. Supp. 1160, 1166-67 (E.D. Mo. 1982); Das, 2010 WL 4615336, at *5. The requirements of Rule 9(b) must be interpreted "in harmony with the principles of notice pleading." Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001) (citations omitted); see also SEC v. Physicians Guardian Unit Inv. Trust, 72 F. Supp. 2d 1342, 1352 (M.D. Fla. 1999) (in securities context, courts must be careful to "harmonize the directives of Fed.R.Civ.P. Rule 9(b) with the broader policy of notice pleading"). The purpose of the rule "is to ensure that allegations are specific enough to provide defendants sufficient notice of the acts complained of and to enable them to prepare an effective response and defense, to eliminate those complaints filed as a pretext for the discovery of unknown wrongs, and to protect defendants from unfounded charges of wrongdoing that injure their reputations and goodwill." Id.

-12-

The complaint here meets the requirements of Rule 9(b).  The SEC identifies specific statements in fund documents that expressly prohibited the transfers to Morriss and Morriss Holdings, ¶¶ 32-33, or failed to advise investors that funds would be transferred to them rather than put to use for their intended purpose, ¶¶ 34-35. The complaint also identifies specific allegedly false representations that Morriss made to purchasers of Gryphon's preferred shares.  ¶¶ 43-45.  The complaint also identifies specific transfers that made these statements false or misleading.  ¶¶21, 24, 26, 44. Finally, the complaint identifies statements made to MIC VII investors regarding their consent to additional shares and the actions that made those statements false or misleading.  ¶¶ 37-41.  These allegations are sufficient to provide defendant Morriss with adequate notice to enable him to prepare an adverse pleading.  See Physicians Guardian Unit, 72 F. Supp. 2d at 1352 (Rule 9 satisfied where SEC alleged that defendant disseminated offering materials that grossly understated the percentage of invested funds that would go to nonproducing expenses, overstated qualifications of personnel, and omitted material facts).

### D.    Sufficiency of the Allegations under Rule 12(b)(6)

Counts I and II assert claims pursuant to Section 17(a) of the Securities Act, which makes it unlawful for any person, directly or indirectly in the offer or sale of securities:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Securities Exchange Act (Counts III and IV) makes it

unlawful for any person, directly or indirectly:

> (b) To use or employ, in connection with the purchase or sale of any security .
> . . any manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under the authority of this section,

makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light of
> the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase
> of sale of any security.

17 C.F.R. § 240.10b-5.

To establish violations of these antifraud provisions, the SEC must show that the

defendants engaged in (1) misrepresentations or omissions of material facts (2) made

in connection with the offer, sale or purchase of securities.  SEC v. Shanahan, 646 F.3d

536, 541 (8th Cir. 2011).  Violation of § 17(a)(1), § 10(b), and Rule 10b–5 require

proof that a defendant made misrepresentations or misleading omissions with scienter;

violation of § 17(a)(2) and (3) require proof that the defendant acted negligently.  Id.

(citing Aaron v. SEC, 446 U.S. 680, 695, 697 (1980)).  The element of scienter

requires proof of "intent to deceive, manipulate, or defraud."  Id. (quoting Ernst &

Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).

Section 206 of the Investment Advisers Act (Counts V through VIII) makes it

unlawful for any investment adviser,

> by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
>
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; [or]
>
>  * * *
>
> (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b-6.  The implementing rule, 17 C.F.R. § 275.206(4)-8(A)(2) proscribes

"engag[ing] in any act, practice, or course of business that is fraudulent, deceptive, or

manipulative with respect to any investor or prospective investor." "Facts showing a

violation of Section 17(a) or 10(b) by an investment adviser will also support a showing

of a Section 206 violation." SEC v. Young, No. 09–1634, 2011 WL 1376045, at *7

(E.D. Pa. Apr. 12, 2011) (quoting SEC v. Haligiannis, 470 F. Supp. 2d 373, 383

(S.D.N.Y. 2007)).

### 1.    "Securities"

Defendant Morriss Holdings generally asserts that the SEC has failed to allege

that the investments or membership interests at issue are "securities" as defined by

federal law.

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit sharing agreement, . . . transferable share, investment contract, . . . or in general, any instrument commonly known as a "security"; . . .

15 U.S.C. § 78c(10); see also 15 U.S.C. § 77b(a)(1) and 15 U.S.C. § 80b-2(18).

Where, as here, defendants characterize their offerings as securities under circumstances where investors have reason to believe this characterization, the investments at issue satisfy the definition of "security." See Diaz Vicente v. Obenauer, 736 F. Supp. 679, 693 (E.D. Va. 1990) (document was a "security" where it referred to contributions as "investments", in absence of countervailing factors that would lead reasonable person to question this characterization). [2]

## 2.   "In Connection With"

Defendants challenge the sufficiency of the SEC's allegations that the fraud was "in connection with the offer or sale" of securities.

The Supreme Court has stated that in SEC enforcement actions, this requirement "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." SEC v. Zandford, 535 U.S. 813, 819 (2002). At the same time, "the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of" the securities statutes. Id. at 820. "Under Supreme Court case law, fraudulent activity meets the 'in connection with' requirement . . . whenever it 'touches' or 'coincides' with a securities transaction." SEC v. Pirate Investor LLC 580 F.3d 233, 244 (4th Cir. 2009) "It is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 85 (2006). Furthermore, "[w]hile interpretations of 'in connection

_____

[2]Morriss Holdings does not reassert that the investments were not securities in its reply and the Court assumes that its argument on this basis was in the nature of a rhetorical device to highlight the alleged shortcomings in the complaint, and not a serious attack on the SEC's claim that the defendants' products meet the definition of "security."

-16-

with' continue to change as applied to private plaintiffs, its meaning in SEC actions remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors." SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993).

Defendants characterize the complaint as alleging only that sometime between 2003 and 2011, approximately 100 investors made an investment. This allegation, they argue, is insufficient to establish that the alleged fraud occurred in connection with a sale or purchase of a security. This is a disingenuous reading of the complaint. The SEC alleges that defendants made misstatements or omissions in the operating documents and offering agreements for the securities which were made available to investors. The misstatements thus were made in connection with the sale of securities. See SEC v. Private Equity Mgmt. Group, No. CV 09-2901 PSG, 2009 WL 2019788, at *13-14 (C.D. Cal. July 2, 2009) (in discussion of "in connection with" requirement, noting that offering documents were provided to potential investors). The SEC also alleges that between March 2008 and August 2010, Morriss solicited new investors; the resulting funds were transferred immediately to defendant Morriss, Morriss Holdings, or to Wachovia Bank to satisfy a debt, rather than to the investments themselves. Finally, the SEC alleges that Morriss fraudulently added new investors to MIC VII and diluted the shares of the existing investors. These allegations are sufficient to satisfy the "in connection with" requirement. See SEC v. Merrill Scott & Assoc., Ltd., No. 2:02CV39-TC, 2011 WL 5834271, at *10 (D. Utah Nov. 21, 2011) (broker's failure to inform investors that investor money would be used to subsidize profligate lifestyle constituted omission in connection with sale of security); SEC v. Saltzman, 127 F. Supp. 2d 660, 667 (E.D. Penn. 2000) ("in connection with" requirement satisfied where SEC alleged that defendant created annual statements on

which investors relied, provided information to prospective investors, and encouraged reinvestment while failing to disclose his misappropriation of funds).

Defendant Morriss contends that improper fund transfers that occurred after the completion of securities transactions are too tenuous to establish that the alleged fraud was in connection with the transaction. The Court disagrees. If the SEC can establish, as it alleges, that Morriss made material misrepresentations to investors in order to obtain additional investor funds for improper purposes, it will have satisfied the "in connection with" requirement. See Private Equity Mgmt., 2009 WL 2019788 at *14 (violation of securities laws established where investment funds were used to pay unearned fees, fund exorbitant overhead, and make loans to other entities owned by defendant). Questions regarding the timing of misstatements or omissions in relationship to investments and fraudulent transfers cannot be resolved on a motion to dismiss. The SEC has adequately alleged that Morriss made misstatements or omissions in connection with the sake or purchase of securities.

### 3.    Scienter

Scienter is a required element for claims under the Securities Act § 17(a)(1), the Exchange Act § 10(b) and Rule 10b-5, and the Advisers Act § 206(1). Aaron v. SEC, 446 U.S. 680, 701-02 (1980). The element of scienter requires proof of "intent to deceive, manipulate, or defraud." Shanahan, 646 F.3d at 543-44. The Eighth Circuit holds that "a finding of scienter may be based upon 'severe recklessness' . . . requiring proof of 'something more egregious than even white heart/empty head good faith." Id. (citations and internal quotations omitted). However, "unlike a private plaintiff who must allege scienter with particularity under the Private Securities Litigation Reform Act, the SEC may allege scienter generally under the explicit

language of Rule 9(b), which states that '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" SEC v. Medical Capital Holdings, Inc., No. SACV 09-0818 DOC, 2010 WL 809406, at *3 (C.D. Cal. Feb. 24, 2010). Finally, the scienter of the senior officers of corporations may be attributed to corporations under the securities laws when "those senior officials were acting within the scope of their apparent authority." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1106-07 (10th Cir. 2003).

Here, the SEC alleges that it was at Morriss's direction that documents provided to investors failed to disclose that he would divert investment funds for his personal use. The SEC further alleges that Morriss solicited new investments knowing that the funds would be used to pay his personal debts. Finally, he continued to misappropriate investor funds once he knew that the investment entities were themselves experiencing financial difficulty and that he could not reimburse them due to his own poor financial condition. A reasonable factfinder could determine from these allegations that Morriss acted with "intent to deceive, manipulate or defraud." The SEC has adequately pleaded scienter.

### 4.    Materiality

A misstatement or omission violates the securities laws only if it is material. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). In this case, a reasonable investor would have considered it important that investment funds

-19-

were not being used for their stated purpose but were being diverted to Morriss's personal use. See SEC v. Mannion, 789 F. Supp. 2d 1321, 1341 (N.D. Ga. 2011) (factfinder could conclude that "it is material that the advisers . . . used Fund assets for purposes other than for the benefit of the Fund"); I-Enterprise Co. LLC v. Draper Fisher Jurvetson Mgmt. Co. V, LLC, No. C-03-1561 MMC, 2005 WL 3590984, at *22 (N.D. Cal. Dec. 30, 2005) ("reasonable trier of fact could find that an investor would deem it material that fund assets were being used to purchase stock for others at the fund's expense, even if that money was later repaid"); Saltzman, 127 F. Supp. 2d at 667 (SEC satisfied materiality element where it alleged that general partner diverted 20% of investor funds to a personal account). The fact that the investors in this case were what Morriss calls "sophisticated" does not alter the analysis – any investor, without regard for the degree of sophistication, would find it material that invested funds were not used for their stated purpose.

### 5. Duty to Disclose

Morriss contends that the SEC cannot establish that the defendants had a duty to disclose to investors that funds were being transferred to Morriss and Morriss Holdings. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levison, 485 U.S. 224, 239 n. 17 (1988). "A duty arises, however, if there have been inaccurate, incomplete or misleading disclosures." Sailors v. Northern States Power Co., 4 F.3d 610, 612 (8th Cir. 1993). A party who "discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects." In re K-tel Int'l, Inc. Securities Litigation, 300 F.3d 881, 897-98 (8th Cir. 2002) (internal quotations and citation omitted). The law requires "an actor to provide complete and non-misleading information with respect to the subjects

-20-

on which he undertakes to speak." Id. Defendants made statements to investors regarding the use of invested funds. Having done so, they had a duty to provide complete information on that subject. See Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 596 (2001) (upholding violation of § 10(b) where seller of option secretly intended not to honor the option); SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011) (true statements that create a materially misleading impression will support claim for securities fraud); see also SEC v. Curshen, 372 Fed. Appx. 872, 880-81 (10th Cir. 2010) (individual making anonymous postings on the internet promoting the sale of a stock had duty to disclose that he was compensated to promote stock).

### 6.    The Investment Adviser Act Claims

The SEC alleges, in Counts V and VII, that defendants Morriss, Acartha, and Gryphon Investments violated § 206 of the Investment Advisers Act.  Defendant Morriss contends that the these claims fail because the SEC has not alleged that (1) he is an investment adviser as defined in the act and (2) he defrauded the funds.

The Supreme Court has concluded that "Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation enacted for the purpose of avoiding frauds, not technically and restrictively, but flexibly to effectuate its remedial purposes." SEC v. Bolla, 401 F. Supp. 2d 43, 59 (D.D.C. 2005) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)).

The act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C.A. § 80b-2(11).  The SEC alleges that the defendants offered and sold securities, that Acartha and Gryphon Investments were

-21-

investment management companies, and that they received management fees and a percentage of the carried interest.   The SEC further alleges that Morriss received "compensation" in the form of misappropriated investor funds.   Morriss does not challenge this definition of "compensation" and the Court finds that the SEC has sufficiently pleaded the elements necessary to show that defendants are "investment advisers" within the meaning of the act.

Defendant Morriss additionally argues that the SEC fails to allege that "any client or prospective client" was defrauded, as required under the Act.   In the context of private equity funds, the "client" is the fund itself, not the investors in the fund.   See Mannion, 789 F. Supp. 2d at 1338 (to support a claim under the Investment Adviser Act, "the SEC must plausibly allege that Defendants employed a 'device, scheme, or artifice to defraud' the Fund itself, rather than the Fund's investors") (citing Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006)).   The SEC contends that Morriss, Acartha, and Gryphon owed MIC VII and ATP a fiduciary duty to act for the benefit of the funds, and that Morriss, acting through Acartha and Gryphon, violated that duty by misappropriating funds for his own use, thereby harming the funds' financial viability. Morriss does not contest that the breach of a fiduciary duty owed to the funds can serve as the basis for a claim under the Investment Advisers Act.   See id. at 1338-39 n.13 (defendants owe fiduciary duties to fund and harm against the fund is not ignored simply because it is ultimately borne by the investors).   He asserts, however, that the SEC's allegations that he "borrowed" money from the funds and "owed" them money cannot amount to the breach of a fiduciary duty.   In making this argument, Morriss ignores the allegations that he continued to "borrow" money from the funds even when he was aware that he would have difficulty repaying them.   He also argues that it is

-22-

illogical to name ATP and MIC VII as wrongdoers in the securities fraud counts and as victims in the investment adviser counts.  On the basis of the allegations as set forth in the complaint, the Court concludes that there is no bar to the SEC bringing claims against ATP and MIC VII pursuant to the securities fraud acts and defining them as victims under the investment adviser's act.

### 7.    The Aiding and Abetting Claims

To establish liability under an aiding and abetting theory, the SEC must establish:  (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;  (2) knowledge of the violation on the part of the aider and abettor;  and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.  SEC v. Pentagon Capital Management PLC, 612 F. Supp. 2d 241, 266 (S.D.N.Y. 2009) (citations and quotations omitted).  "The aider and abettor's substantial assistance must be a proximate cause of the primary violation."  Id.

Defendant Morriss asserts that the aiding and abetting claims must be dismissed because the SEC has failed to properly allege the underlying substantive claims.  The Court has rejected his challenge to these claims and thus the SEC's aiding and abetting claims survive his motion to dismiss.

### IV.    Conclusion

For the reasons discussed above, the Court concludes that the SEC has adequately stated claims upon which relief may be granted, and has done so with sufficient particularity to satisfy Fed.R.Civ.P. 9(b).

Accordingly,

-23-

**IT IS HEREBY ORDERED** that the motion of relief defendant Morriss Holdings, LLC, to dismiss or, in the alternative, for a more definite statement [Doc. #83] is **denied**.

**IT IS FURTHER ORDERED** that the motion of defendant Burton Douglas Morriss to dismiss or, in the alternative, for a more definite statement [Doc. #86] is **denied**.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2012.